## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) MARIA HETHERINGTON, as Special Administrator to the Estate of CHRISTOPHER HETHERINGTON, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(1) LEFLORE COUNTY DETENTION CENTER PUBLIC TRUST,<br>(2) DOES Nos. 1-10,<br>(3) STIGLER HEALTH & WELLNESS CENTER, INC.,<br><br>Defendants. | Case No. 21-CV-121-RAW<br><br>JURY TRIAL DEMANDED<br><br>ATTORNEY LIEN CLAIMED |

## AMENDED COMPLAINT

**COMES NOW**, Plaintiff Maria Hetherington, as the Special Administrator of the Estate of Christopher Hetherington ("Mr. Hetherington" or "Christopher"), deceased, and, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, and by the written consent of the opposing parties, submits this Amended Complaint. For her claims and causes of action, Plaintiff states and alleges the following:

### PARTIES, JURISDICTION AND VENUE

1. Maria Hetherington is a citizen of LeFlore County, Oklahoma and the duly-appointed Special Administrator of the Estate of Christopher Hetherington. Plaintiff is Christopher Hetherington's sister. The survival causes of action in this matter are based on violations of Christopher's rights under the Fourteenth Amendment to the United States Constitution.

1

2.      Defendant LeFlore County Detention Center Public Trust ("Jail Trust") is a Public Trust, created pursuant to a certain "Trust Indenture" and the provisions of 60 Okla. Stat. § 176, *et. seq.* The Jail Trust was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the LeFlore County Detention Center ("LCDC" or "Jail"), including the policies, practices, procedures, and/or customs that violated Christopher's rights as set forth in this Amended Complaint. The Jail Trust was, at all pertinent times, responsible for staffing the Jail and overseeing its day-to-day operations. At all pertinent times, the Jail Trust was acting under color of State law, as set forth herein.

3.      Defendants DOES ## 1-10 are employees or agents of the Jail Trust who are unidentified at this time, and, as described more fully below, committed underlying violations of Christopher's Constitutional rights.

4.      Defendant Stigler Health & Wellness Center, Inc. ("Health & Wellness") is an Oklahoma corporation doing business in LeFlore County, Oklahoma. Health & Wellness is a private health care company that contracts with counties, including, during the pertinent timeframe, LeFlore County, to provide medical professional staffing, supervision and care to detainees and inmates housed in county jails. On information and belief, Health & Wellness was responsible, in part, for providing medical services, supervision and medication to Christopher while he was housed at the LCSO. Health & Wellness was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. Health & Wellness was, at all times relevant hereto, endowed by LeFlore County with powers or functions governmental in nature, such that Health & Wellness became an agency or instrumentality of the State and subject to its constitutional limitations.

2

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

8. Paragraphs 1-7 are incorporated herein by reference.

- **Facts Specific to Christopher Hetherington**

9. On January 14, 2020, Christopher Hetherington appeared before the LeFlore County District Court for an accelerated sentencing hearing pursuant to charges pending from the previous May.

10. The presiding judge noted "the Defendant [Christopher] appears intoxicated. The Court increases his bail and commits him to LCDC." During the court appearance, Christopher was confused and disoriented and lost consciousness. He was booked into the Jail the very same day.

11. Upon information and belief, upon presentation at the Jail, Christopher exhibited severe confusion, loss of consciousness and excessive sweating. These were signs of a serious and urgent medical condition. It would have been obvious, even to a layperson, that Christopher required an urgent medical assessment, including recording his vital signs.

3

12. Nevertheless, on information and belief, and in deliberate indifference to his serious medical needs, booking staff (both detention and medical staff) provided no assessment and did not refer Christopher for a medical evaluation by a competent medical professional.

13. Rather, Christopher was placed in a cell where his condition rapidly deteriorated.

14. On information and belief, during the many hours that Christopher was in the cell, he exhibited clear symptoms of delirium tremens, an emergent medical condition requiring hospitalization. On information and belief, these symptoms included: severe confusion, loss of consciousness, hallucinations, sleep disturbances, fever, high blood pressure, rapid heartbeat, excessive sweating and dehydration.

15. On information and belief, over many hours, both detention and medical staff observed Christopher in this state of delirium tremens on multiple occasions. Nevertheless, in deliberate indifference to Christopher's serious medical needs, detention and medical staff alike, who observed Christopher, provided no assistance whatsoever.

16. Sometime on or about the morning of January 15, 2020, Jail Staff were alerted that Mr. Hetherington was having a seizure after other prisoners began kicking the dorm room door.

17. Jail staff found Hetherington unresponsive and he was later pronounced dead on the scene by emergency responders after life-saving measures were administered, to no avail.

18. The Office of the Chief Medical Examiner (OCME) for the State of Oklahoma determined, in an autopsy conducted on January 16, 2020, Christopher's death was caused by hypertensive atherosclerotic cardiovascular disease, essentially high blood pressure and arteries clogged by plaque build-up. *Notably, no alcohol or drugs were detected in Christopher's system*.

19. "Chronic ethanol abuse" was identified by the medical examiner as a pathological diagnosis. Again, on information and belief, some, if not all, of the symptoms Christopher exhibited

at the Detention Center were caused by alcohol withdrawal / were a manifestation of delirium tremens.

20. According to American Addition Centers (AAC), "Many people with a ***history of chronic alcohol abuse*** will exhibit withdrawal ***symptoms*** when they discontinue or decrease their alcohol use." AAC also identifies ***seizures*** and delirium tremens as potential consequences of alcohol withdrawal, with delirium tremens specifically leading to the possibility of: severe confusion, nervous or angry behavior, extreme hyperactivity, global confusion, loss of consciousness, hallucinations, sleep disturbances, fever, high blood pressure, rapid heartbeat, excessive sweating, and/or dehydration.[1]

21. As stated above, on information and belief, Christopher had most, if not all, of these symptoms while housed in the Jail.

22. Other contributing pathologic diagnoses noted in the OCME report include schizophrenia and hepatosplenomegaly (swollen spleen and liver).

23. Schizophrenia is a serious mental health disorder that manifests in visual and/or auditory hallucinations. On information and belief, coupled with alcohol withdrawal / delirium tremens, Christopher's schizophrenia was causing him to hallucinate and he was experiencing an obvious psychotic breakdown. This, too, was a serious medical / mental health condition that was disregarded by detention and medical staff at the Jail.

24. Upon information and belief, Christopher *never* received a medical or toxicology screening, was *never* medically assessed by medical personnel, was *not evaluated* by anyone at the Jail (*i.e.*, Jail Trust and/or Health & Wellness personnel)  for any medical conditions or complications, and

---

[1] https://americanaddictioncenters.org/alcoholism-treatment/delirium-tremens-symptoms-and-treatment

5

Christopher otherwise was *not assessed* for any intoxicating substance in his bodily systems or disease that may have contributed to behavior one could construe as appearing intoxicated.

25. Christopher was experiencing a traumatic and severe medical and mental health episode, and he was left to languish in a holding cell until he succumbed to his illness(es).

26. Even if Jail Trust and/or Health & Wellness personnel, including DOES ## 1-10, believed Christopher was intoxicated, they failed to comply with the essential standards for receiving screening of the National Commission on Correctional Health Care (NCCHC). According to the NCCHC, "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." However, upon information and belief, Christopher did not receive any medical evaluation.

27. According in NCCHC guidance:

> Reception personnel need to ensure that people who are unconscious, semiconscious, bleeding, **mentally unstable, severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and a medical clearance into the facility**. This documented clinical assessment of medical, dental and/or mental status **may come from on-site qualified health care professionals or may require sending the individual to the hospital emergency room**…[t]he receiving screening is a process of structured inquiry and observation **intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment**. In jails and juvenile facilities, **the screening may be conducted by health-trained correctional personnel or qualified health care professionals**…[a]dministrators should consider the risks of not knowing an inmate's medical condition (e.g., suicidal ideation, prescription medications, communicable illness symptoms, drug and alcohol use and/or withdrawal symptoms) when designing the intake and receiving screening process…**[s]taff need to get an idea of inmates' urgent health needs, identify and meet any known or easily identifiable needs that require medical intervention**, and identify and isolate inmates who may be contagious. **All immediate health needs identified through the screening**

>**process should be properly addressed by qualified health care professionals**. When inmates indicate they are under treatment for a medical, dental, mental health or substance use problem, **health staff should initiate a request for a health summary from the community prescribers after obtaining a signed release from the patient**.

(Emphasis added). *See* https://www.ncchc.org/filebin/CorrectCare/33-2.pdf.

28. Christopher received a level of attention and care nowhere near those stated in the NCCHC guidelines. This abdication of responsibility led to Christopher's unfortunate suffering, a worsening of his condition and, ultimately, his demise.

29. At all pertinent times of Christopher's incarceration, Health & Wellness was contracted to provide medical care to LCDC inmates.

30. Responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, utterly failed to 1) medically screen Christopher when he arrived at the Jail; 2) provide for Christopher's continued wellbeing while he was incarcerated; and 3) address the emergent health conditions which ultimately led to Christopher's death. These actions, or lack thereof, constitute deliberate indifference to Christopher's obvious medical needs.

31. Upon information and belief, the Jail Trust and Health & Wellness abdicated their responsibility to properly train their staff to medically supervise and care for inmates with serious and complex medical / mental health conditions, including Hypertensive atherosclerotic cardiovascular disease, schizophrenia, alcohol abuse withdrawal, delirium tremens and/or Hepatosplenomegaly.

32. Upon information and belief, responsible Jail Trust and/or Health & Wellness staff did not treat Christopher whatsoever despite his known and obvious symptoms, in deliberate indifference to his medical needs. Upon information and belief, responsible Jail Trust and/or Health &

7

Wellness staff did not refer Christopher to qualified medical personnel capable for caring for him, despite his known and obvious symptoms, in deliberate indifference to his medical needs.

- **<u>Policies, Customs, and Practices of the LCSO/LeFlore County Sheriff</u>**

34.     There is a causal nexus between Christopher's suffering and certain policies and customs in place at the LCDC.

35.     There is a long and deep-seated history and unabated custom of failing to provide adequate medical and mental health care for inmates at the Jail. For instance, there have been multiple negative medical outcomes at the Jail that resulted from deliberate indifference to a serious medical need/violations of standard of care. These include: (A) deliberate indifference (in 2017) to the obviously emergent health conditions of inmate Elier Hernandez, who died of acute bronchopneumonia and hypertensive atherosclerotic disease; and (B) deliberate indifference (in 2014) to the medical needs of Douglas Cook who died of acute pneumonitis at the Detention Center.

36.     The pattern and practice of severely insufficient inmate medical care at the Jail is further evidenced by a U.S. Department of Justice ("DOJ") investigation conducted in 2002 and 2003 pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. In its report, the DOJ castigates the LeFlore County for unconstitutional violations of inmates' civil rights, specifically the right to adequate medical care.

37.     According to the DOJ report:[2]

> Based on our investigation, and as described more fully below, we conclude that certain conditions at the Jail violate the constitutional rights of inmates. We find that persons confined at the Jail risk serious injury from deficiencies in the following areas: security and protection from harm, access to medical and mental health care, fire safety, environmental health and safety…The provision of medical services to inmates at the Jail is seriously deficient and places inmates at risk of harm. Most fundamentally, the Jail has no on-site medical care provider. In addition, no

---

[2] https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/leflore_county_findlet.pdf

> medical professionals screen inmates for medical concerns or supervise or follow-up on outside medical visits. Further, the Jail fails to maintain any records on the sporadic health care provided to the inmates in its custody...The intake screening process is insufficient to ensure that inmates receive necessary medical care while incarcerated...Detention officers, who themselves have no medical training, determine when, or if, an inmate receives medical attention. This is a significant and unacceptable departure from universally accepted standards of care.

38. There is a causal connection between the violations described by the DOJ's investigation and LSCO's treatment of Christopher. The violations outlined by the DOJ were, upon information and belief, not reasonably addressed at the time or ever, and Christopher was placed at excessive risk of harm as a result.

39. Upon information and belief, the Jail Trust has utterly failed to train its Detention Center staff on how to supervise, monitor and care for medically supervise and care for inmates with serious and complex medical / mental health conditions, including Hypertensive atherosclerotic cardiovascular disease, schizophrenia, alcohol abuse withdrawal, delirium tremens and/or Hepatosplenomegaly, with deliberate indifference to the consequences. This failure is especially problematic considering that, according to the United Health Foundation, almost 38% of adult Oklahomans suffer from high blood pressure.[3]

40. Upon information and belief, the Jail Trust has consistently and badly failed to supervise its employees at the Detention Center, and failed to assure that the employees are providing adequate medical monitoring, assessment and care of inmates, like Christopher, with serious medical needs.

41. Upon information and belief, the Jail Trust has maintained a custom of inadequate medical care for years which poses excessive risks to the health and safety of inmates like Christopher.

---

[3] https://www.americashealthrankings.org/explore/annual/measure/Hypertension/state/OK

9

42. There is a causal link between the above-described policies and customs, with respect to the inadequate provision of medical care to inmates, and Christopher's Constitutional injuries.

43. The Jail Trust /LeFlore County knew of, or should have known of, excessive risks to the health and safety of inmates like Christopher, but failed to take reasonable measures to alleviate those risks.

44. Moreover, the deliberate indifference to Christopher's serious medical needs, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices which the Jail Trust/LeFlore County promulgated, created, implemented or possessed responsibility for the continued operation of.

## CAUSE OF ACTION

## VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
## (42 U.S.C. § 1983)

### A. LCDC Staff/Underlying Violations

45. Paragraphs 1-44 are incorporated herein by reference.

46. Responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, described above, knew — or it was obvious — that there were substantial risks to Christopher's health and safety.

47. As described *supra*, Christopher had serious and emergent medical and mental health conditions that were known and/or obvious to responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, . It was obvious that Christopher needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Indeed, Christopher was left to languish in a cell for hours, despite his obvious, serious and emergent medical needs. Responsible Jail Trust and/or Health & Wellness personnel,

including DOES ##1-10, disregarded the known, obvious and substantial risks to Christopher's health and safety.

48. Under the circumstances, responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, had a duty and obligation to assure that Christopher received treatment or access to medical personnel capable of evaluating the need for treatment. They did neither, in deliberate indifference to Christopher's serious medical needs.

49. Responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, were also deliberately indifferent under a purely objective standard of liability. That is, responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, did not take reasonable available measures to abate the obvious risk of substantial harm to Christopher.

50. As a direct and proximate result of this deliberate indifference, as described above, Christopher experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

51. As direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Christopher's rights secured by the U.S. Constitution, including punitive damages.

**B.     Municipal Liability (Jail Trust and Health & Wellness)**

52. Paragraphs 1-51 are incorporated herein by reference.

53. The aforementioned acts and/or omissions of responsible Jail Trust and/or Health & Wellness personnel, including DOES ##1-10, in being deliberately indifferent to Christopher's health and safety and violating Christopher's civil rights are causally connected with customs, practices, and policies which the Jail Trust promulgated, created, implemented and/or possessed responsibility for.

54. Such policies, customs and/or practices are specifically set forth in paragraphs 34-44, *supra*.

55. The Jail Trust, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Christopher's, health and safety.

56. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Christopher suffered injuries and damages as alleged herein.

58. Health & Wellness is a "person" for purposes of 42 U.S.C. § 1983.[4]

59. At all times pertinent hereto, Health & Wellness was acting under color of State law.

60. Health & Wellness has been endowed by LeFlore County with powers or functions governmental in nature, such that Health & Wellness became an instrumentality of the State and subject to its constitutional limitations.

61. Health & Wellness is charged with implementing, in part, and assisting in developing the policies of the Jail Trust/LeFlore County with respect to the medical and mental health care of inmates at the Jail.

62. In addition, Health & Wellness implements, maintains and imposes its own corporate policies, practices, protocols and customs.

63. On information and belief, there is an affirmative causal link between the aforementioned acts and/or omissions of Health & Wellness medical staff, as described above, in being deliberately

---

[4] "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants*." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005).

indifferent to Christopher's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Health & Wellness.

64. On information and belief, Health & Wellness knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Christopher. Nevertheless, Health & Wellness failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Christopher's, serious medical needs.

65. On information and belief, Health & Wellness tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

66. On information and belief, there is an affirmative causal link between the aforementioned customs, policies, and/or practices and Christopher's injuries and damages as alleged herein.

67. Health & Wellness is also vicariously liable for the deliberate indifference of its employees and agents.

**WHEREFORE**, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119

>(918) 585-2667 P
>(918) 585-2669 F
>danielsmolen@ssrok.com
>bobblakemore@ssrok.com
>
>***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of December 2021, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

>/s/Daniel E. Smolen